**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DAVID GRAY,               )
                                     )
        Plaintiff,       )
                                     )
      v.              )          No. 16 C 4850
                                     )
JOHN E. ZARUBA, SHERIFF OF   )          Magistrate Judge Finnegan
DUPAGE COUNTY,        )
                                     )
        Defendant.     )

## MEMORANDUM OPINION AND ORDER

Plaintiff David Gray filed suit alleging that Defendant Sheriff of DuPage County, John E. Zaruba, fired him from his position as a probationary Deputy Sheriff due to his race (black) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Count I), and his rights under the Equal Protection Clause, with a remedy under 42 U.S.C. § 1983 (Count II).[1]  Plaintiff also alleges that Defendant fired him based on the fact of an arrest in violation of the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/2-103 (Count III).  On December 3, 2018, the day before the case was set to go to trial in front of the assigned district judge, the parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  After settlement negotiations failed, this Court granted the parties' request to file motions for summary judgment.  Defendant's motion seeks summary judgment on all of Plaintiff's claims, while Plaintiff's motion seeks

---

[1]      On November 27, 2018, the district judge alerted the parties that DuPage County may be a necessary party pursuant to *Carver v. Sheriff of LaSalle County, Ill.*, 324 F.3d 947, 948 (7th Cir. 2003).  (Doc. 41).  This Court raised the issue again during a telephone status on January 14, 2019.  Defense counsel characterized the matter as "pro forma" and neither party has sought to add DuPage County as a named defendant.  During oral argument before this Court on June 26, 2019, both parties confirmed that Sheriff Zaruba is being sued in his official capacity.

partial summary judgment on his IHRA claim. For reasons set forth here, Defendant's motion is granted as to Plaintiff's race discrimination claims and the Court declines to retain jurisdiction over the remaining IHRA claim.

## BACKGROUND

Since the Court is considering the merits only of Defendant's motion for summary judgment of the race discrimination claims, it "constru[es] all facts and "draw[s] all inferences in favor of [Plaintiff,] against whom the motion under consideration was filed." *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017). The material facts in this case, however, are largely undisputed.

**A.    Plaintiff's Probationary Status**

Plaintiff was hired as a DuPage County Sheriff's Office correctional deputy in 2011. (Doc. 69 ¶ 6; Doc. 72 ¶ 6). In early January 2015, he applied for a transfer to the Law Enforcement Bureau by submitting a letter and taking the required "power test" for physical fitness. (Doc. 72 ¶ 7; Doc. 56-3, at 6, Plaintiff Dep., at 13-14). After passing the test, Plaintiff became a probationary Deputy Sheriff. (Doc. 72 ¶ 7). As of his termination on January 20, 2015, Plaintiff was completing his second week of training in the police academy. (Doc. 56-2, at 6, Plaintiff Dep., at 16).

During the probationary period of employment, a deputy sheriff could be discharged or demoted for any reason not prohibited by law. (Doc. 72 ¶¶ 32-33; Doc. 56-7, Letter of 1/20/2015) (quoting "section 6.1 of the Arbitrated Award between the DuPage County Sheriff, County of DuPage and MAP Chapter #126."). Non-probationary employees, on the other hand, were covered under the bargaining unit and could not be terminated (or even suspended over a certain number of days) without a hearing before

the Merit Commission or an Arbitrator. (Doc. 56-4, at 14-15, Sterenberg Dep., at 13-14; Doc. 56-5, at 8, 47, 29, Bibbiano Dep., at 25, 109, 180).[2]

## B.    Plaintiff's Arrest for Domestic Battery

The following information concerning Plaintiff's arrest for domestic battery on January 18, 2015 (2 days before his termination) is taken exclusively from arrest reports completed by the Oak Park Police Department.

At approximately 1 a.m. on January 18, 2015, Oak Park Police Officer M. Schrock was waved down by a passing pedestrian who pointed to Plaintiff's truck stopped in a Jiffy Lube parking lot, and reported a male and female yelling at each other in a possible domestic dispute. (Doc. 64, Arrest Report, at 3). As Officer Schrock approached the truck, he saw it quickly leave the Jiffy Lube parking lot and travel northbound. The officer followed in his patrol car and stopped the truck some distance away. He once again approached the truck and heard a male voice yelling "Get out of the car!" The officer also saw that the passenger (later identified as Plaintiff's wife) was "bleeding from the top of the forehead, along with a large bump above her right eye and on the right side of her forehead." Additionally, the officer observed that the passenger was "holding a tissue paper in her hand that she used to wipe the blood from her face." (*Id.*). The officer took photos of the passenger's forehead that depict the bump, and these were included with the arrest report. (Doc. 56-3, at 13, Plaintiff's Dep., at 44).

At the scene, Officer Schrock separately questioned both Plaintiff and his wife about what had happened. The wife said she had been involved in a verbal altercation

---

[2]    The Merit Commission is a three-member board that makes disciplinary decisions relating to permanent deputies with merit protection who are facing suspension of 30 days or more, or who are otherwise entitled to procedural protections under the applicable collective bargaining agreement. (Doc. 56-5, at 8, Bibbiano Dep., at 23-25).

with her husband, and while in the Jiffy Lube parking lot, the verbal altercation had "turned physical when [Plaintiff] pushed her head into the front passenger side window." Officer Schrock saw "what appeared to be a print of [Plaintiff's wife's] forehead on the window." Officer Schrock then spoke with Plaintiff who had identified himself as a DuPage County Sheriff. He said the couple had been "involved in a verbal altercation when his wife began kicking him from the front passenger seat." Plaintiff said he then "pushed his wife's head against the window to stop her." According to the report, Officer Schrock did not see any marks on Plaintiff. (Doc. 64, Arrest Report, at 3).

The officer placed Plaintiff under arrest for domestic battery and transported him to the Oak Park police station. (*Id.*; Doc. 65, Police Report, at 1). Once at the Oak Park police station Plaintiff was questioned again and said the couple had been leaving a dance party and were in a verbal altercation when his wife kicked him as he was driving. He said he then stopped the truck in front of 215 S. Harlem where he "pushed his wife's head against the passenger's side window to stop her from kicking him." The next line in the arrest report reads: "Arrestee Gray stated: 'I may have been too heavy handed because I deal with inmates all the time.'" (Doc. 64, Arrest Report, at 3). Plaintiff was charged with domestic battery and held at the station until his later transfer to Cook County Jail. (*Id.*; Doc. 72 ¶ 14; Doc. 73 ¶ 7).

## C.    Paid Administrative Leave

Major Frank Bibbiano, an Internal Affairs Investigator responsible for investigating arrests and other matters that could lead to the discipline or discharge of a DuPage County Sheriff's Office employee, learned of Plaintiff's arrest on January 18th and went to the Oak Park police station to get the police reports. (Doc. 69 ¶ 9; Doc. 72 ¶ 47; Doc.

73 ¶ 22).  Bibbiano spoke to the watch commander, read the reports, and examined the photos of Plaintiff's wife. Later that same day, Bibbiano called Peter Sterenberg, the Acting Law Enforcement Bureau Chief.  (Doc. 69 ¶ 10; Doc. 73 ¶ 20; Doc. 72-6, at 2, 5). Upon learning of the domestic battery charge, Sterenberg directed Bibbiano to begin an investigation and place Plaintiff on paid administrative leave while they determined whether the charge had substance.  (Doc. 69 ¶¶ 12, 14; Doc. 72 ¶¶ 46, 48, 50; Doc. 73 ¶¶ 21, 23, 35).  Sheriff Zaruba agreed this was the appropriate action.  (Doc. 69 ¶ 15). Sterenberg did not have any of the police reports related to the incident in his possession when he made this decision.  (*Id.* ¶ 14; Doc. 72 ¶ 49; Doc. 73 ¶ 24; Doc. 68-3, at 22-23, Sterenberg Dep., at 21-22).

As instructed, Bibbiano gave Plaintiff a document dated January 18, 2015, stating that at the direction of Acting Chief Sterenberg, he was immediately placed on paid administrative leave and his police powers were temporarily suspended.  (Doc. 69 ¶ 16; Doc. 72 ¶¶ 13, 30; Doc. 73 ¶¶ 6, 11; Doc. 56-6, Letter of 1/18/2015).

### D.    Plaintiff's Termination

After receiving the Oak Park police reports from Bibbiano, Sterenberg read them. As noted, these included: the arresting officer's observation that Plaintiff's wife was bleeding from the forehead; the wife's statement that she was involved in a verbal altercation with Plaintiff when he pushed her head into the passenger side window; the officer's observation of a print of a forehead in that window; and Plaintiff's statements to the officer that during the altercation he pushed his wife's head against the window to stop her from kicking him, and he might have been "too heavy handed because I deal with inmates all the time."  (Doc. 73 ¶ 27).  Acting Chief Sterenberg was involved in

employment-related decisions and was authorized to make disciplinary decisions. (*Id.* ¶¶ 18, 19). It is undisputed that it was Sterenberg's opinion and belief after reviewing the police reports, and taking into account that Plaintiff was a probationary employee, that the incident rose to such a level that Plaintiff should be discharged. (*Id.* ¶ 28).

Sterenberg did not review Plaintiff's disciplinary history before recommending discharge because of what was contained in the police reports, specifically, Plaintiff's statement that he may have been too heavy handed because he was a correctional officer. Sterenberg felt that based on that statement, Plaintiff would no longer be able to represent the Sheriff's Office in use of force settings. (*Id.* ¶ 30; Doc. 72 ¶ 55). In making this assessment, Sterenberg took the police reports "at face value." (Doc. 69 ¶¶ 31, 33).

Sterenberg met with Sheriff Zaruba and recommended that Plaintiff be discharged.[3] (Doc. 73 ¶¶ 29, 31). Sheriff Zaruba had never met Plaintiff, and had no knowledge of his racial or ethnic background. (Doc. 72 ¶¶ 35, 66). Sheriff Zaruba had not personally seen the police reports but relied on the information Sterenberg provided. (*Id.* ¶ 65). The Sheriff concurred with Sterenberg's recommendation because it was his understanding that the information contained in the reports from the Oak Park Police indicated that Plaintiff had committed a battery against his wife. (*Id.* ¶¶ 63, 64; Doc. 73 ¶¶ 34, 35). On January 20, 2015 (two days after the arrest), Sheriff Zaruba signed a letter terminating Plaintiff effective that day and noting:

> Pursuant to section 6.1 of the Arbitrated Award between the DuPage County Sheriff, County of DuPage and MAP Chapter #126, "During the probationary period an employee who fails to demonstrate the ability and qualifications necessary for the satisfactory job performance or on the basis of any other reasons deemed sufficient by the employer, may be discharged or demoted for any reason not prohibited by law."

---

[3] As discussed *infra* at 22, there is some evidence that Bibbiano was also at this meeting and also recommended Plaintiff's termination.

(Doc. 56-7, Letter of 1/20/2015).  Bibbiano gave Plaintiff the letter the same day.  (Doc. 72 ¶¶ 31, 63; Doc. 73 ¶ 12).

On January 26, 2019, the criminal charges against Plaintiff were dropped.  (Doc. 69 ¶ 37).  On January 27, 2019, Bibbiano gave his internal affairs report about the incident to Sterenberg.  No one in the Sheriff's Office reviewed that report before Plaintiff was fired.  (*Id.* ¶ 38; Doc. 75 ¶ 13).  As part of his investigation, Bibbiano's report reflects that he spoke with the arresting officer on January 18, 2019 about the property taken from Plaintiff and in possession of the Oak Park Police Department (e.g., his badge, gun, ID card, and wallet) but not the alleged domestic battery.  (Doc. 69 ¶ 18; Doc. 72-6, at 4).  Bibbiano did not speak to Plaintiff or his wife to get their version of the events.  (Doc. 69 ¶¶ 17, 20-22).

## DISCUSSION

### I.   Standard of Review

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  *See also Portalatin v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 125 F. Supp. 3d 810, 813 (N.D. Ill. 2015).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

## II.     Race Discrimination under Title VII and Section 1983 (Equal Protection Clause)

Title VII makes it unlawful for an employer to "discriminate against any individual . . . because of such individual's race . . ." *de Lima Silva v. Dep't of Corrections*, 917 F.3d 546, 559 (7th Cir. 2019) (quoting 42 U.S.C. § 2000e-2(a)(1)).  To succeed on his Title VII claim, Plaintiff must prove three elements:  (1) he is a member of a protected class; (2) he has been the subject of some form of adverse employment action; and (3) Defendant took this adverse action on account of Plaintiff's membership in the protected class. *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (citing *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013)).  The Constitution's Equal Protection Clause similarly protects against intentional discrimination on the basis of race, with Section 1983 providing an employee subjected to such discrimination "a path to relief."  *de Lima Silva*, 917 F.3d at 559 (citing *Lauderdale v. Ill. Dep't of Human Servs.*, 876 F.3d 904, 909 (7th Cir. 2017)).  Like the Title VII claim, Plaintiff can prevail on his Section 1983 claim by demonstrating that Defendant discriminated against him because of his race.  *Id.*  In addition, since Plaintiff's Section 1983 claim is against Sheriff Zaruba only in his official capacity, he must establish that the violation of his constitutional right to equal protection resulted from a municipal policy or custom.  *See Wragg v. Village of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010) ("A village or other municipality may be found liable under § 1983 when it violates constitutional rights via an official policy or custom.").[4]

---

[4]     For purposes of the Section 1983 claim, Plaintiff would need to establish that racial animus was the "but for" cause of the termination rather than a motivating factor.  *Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1262-63 (7th Cir. 1990) ("To be actionable, racial prejudice [under § 1981] must be a but-for cause, or in other words a necessary condition, of the refusal to transact.").  There are other differences between disparate treatment claims under Title VII and Section 1983 but the Court need not address them here.  *See Naumovski v. Norris*, 934 F.3d 200, 214 (2d Cir. 2019) (describing these differences at length).

In assessing the sufficiency of the evidence, the Seventh Circuit has "discarded the long-standing practice of distinguishing between 'direct' and 'indirect' evidence in analyzing discrimination claims." *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 569 (7th Cir. 2017). The legal standard now "'is simply whether the evidence,' considered as a whole, 'would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action.'" *Abrego*, 907 F.3d at 1012 (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). The burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), remains relevant to this analysis as "a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *Abrego*, 907 F.3d at 1012. That said, a plaintiff is not required to proceed under the burden-shifting framework, *David v. Bd. of Trustees of Community College Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017), and Plaintiff does not do so here.

## III.    Analysis of Evidence and Arguments

Defendant argues that summary judgment in his favor is appropriate because Sheriff Zaruba did not even know Plaintiff's race at the time of the discharge, and there is no evidence that Sterenberg harbored any discriminatory animus towards him. Plaintiff does not dispute that Sheriff Zaruba (the sole defendant and sued in his official capacity) was the ultimate decisionmaker and signed the letter that terminated Plaintiff. (Doc. 71, at 11). Nor does he dispute that the Sheriff lacked knowledge of his racial or ethnic background before the termination (Doc. 72 ¶¶ 35, 66), and concurred with the recommendation to terminate because he understood that the information in the Oak Park police reports indicated that Plaintiff had committed a battery against his wife. (*Id.* ¶ 64).

Instead, Plaintiff points to other circumstantial evidence he believes permits a reasonable inference that he was terminated on account of his race. Specifically, Plaintiff argues: (1) Defendant deviated from its stated policies and procedures by failing to offer him progressive discipline; (2) the timing of his discharge so soon after his arrest was suspicious; and (3) he was punished more severely than similarly situated non-black employees who engaged in similar misconduct. The Court addresses each of these below. But even when considered collectively and with the evidence viewed in the light most favorable to Plaintiff, no reasonable jury could find that Plaintiff was terminated on account of his race.

### A.    Progressive Discipline

Plaintiff argues there is evidence of racial animus from the decision to terminate him immediately rather than impose progressive discipline. Defendant admittedly maintained a system of progressive discipline that applied to employees, both probationary and post-probationary. (Doc. 75 ¶ 1; Doc. 68-4, at 10, Bibbiano Dep., at 31). Plaintiff contends the absence of progressive discipline here is significant since "[a]n employer's deviation from its stated procedures and policies provides circumstantial evidence of discrimination." (Doc. 71, at 7-8) (quoting *Blasdel v. Northwestern Univ.*, 787 F. Supp. 2d 759, 771 (N.D. Ill. 2011)). Plaintiff acknowledges that an employee may be discharged for a first offense depending on the seriousness of the alleged conduct, but he stresses that discharge was not a requirement in his case. Rather, he could have received a variety of disciplinary actions ranging from a simple warning to suspension or demotion. (Doc. 69 ¶ 28; Doc. 72 ¶ 62; Doc. 75 ¶¶ 15, 16).

Of course, the fact that all of these options were on the table demonstrates that the progressive discipline policy was discretionary. (Doc. 75 ¶ 1) (parties agree that "[t]here were no rules or criteria as to whether a first offense would lead to discharges or warnings."). "[W]hen a progressive discipline policy permits the employer to exercise discretion in discharging an employee without exhausting all of the policy's steps, failure to follow all of the steps does not suggest a discriminatory motive." *Cannon v. General Supply & Servs., Inc.*, No. 15 C 6982, 2016 WL 7339151, at *9 (N.D. Ill. Dec. 19, 2016) (quoting *Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 353 (7th Cir. 2009)). Moreover, it is undisputed that Plaintiff was a probationary employee who, regardless of any discretionary discipline policy, could be fired for "fail[ing] to demonstrate the ability and qualifications necessary for satisfactory job performance or on the basis of any other reasons deemed sufficient by the employer, . . . or for any reason not prohibited by law." (Doc. 56-7, at 2, Letter of 1/20/2015).[5]

### B. "Suspicious" Timing

Plaintiff additionally argues that the decision to fire him raises an inference of discrimination because it happened so quickly after his arrest and before Bibbiano completed his internal affairs report. Sterenberg recommended to Sheriff Zaruba that Plaintiff should be discharged on January 20, 2015, just two days after the arrest for domestic battery. Sterenberg did not consider Plaintiff's disciplinary history or the fact that he was rated better than average on his most recent December 12, 2014 performance review. (Doc. 69 ¶ 7; Doc. 75 ¶ 18). Nor did Sterenberg review Bibbiano's

---

[5]    It is worth noting that the only non-black employee Plaintiff identifies as having received progressive discipline rather than discharge was a civilian IT employee (he was not a probationary employee but did serve at-will). (Doc. 72 ¶ 11; Doc. 56-5, at 42, Bibbiano Dep., at 158). *See infra* note 7.

internal affairs report, which was not even submitted until a week later on January 27, 2015. (Doc. 75 ¶ 13; Doc. 72 ¶¶ 51, 52, 55). At Bibbiano's deposition, he was asked if he could think of a single instance, other than Plaintiff's, where discipline was issued before his report was completed and reviewed, and he could not. (Doc. 75 ¶ 14; Doc. 60-5, at 40, Bibbiano Dep., at 154-55). In Plaintiff's view, the combination of these events "could not have been more suspicious." (Doc. 71, at 5). *See also Ripberger v. Corizon, Inc.*, 773 F.3d 871, 877 (7th Cir. 2014) (circumstantial evidence of discrimination can include suspicious timing).

"[S]uspicious timing alone is rarely enough to survive summary judgment [in the Title VII context,] particularly when there are reasonable, non-suspicious explanations for the timing of [the] termination." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 711 (7th Cir. 2017) (internal quotations omitted). Here, Sterenberg did not immediately discharge Plaintiff upon learning of his arrest but placed him on paid administrative leave so that Sterenberg could review the police reports and determine whether there was substance to the domestic battery charge. And the parties agree that, after personally reading those reports, and taking into account Plaintiff's probationary status, Sterenberg came to the opinion and belief that the incident rose to such a level that Plaintiff should be discharged. (Doc. 73 ¶ 28).

Significantly, the information gathered by the Oak Park police and summarized in the reports provided Sterenberg with a reasonable basis for terminating the probationary employee. The arrest reports reflected that both Plaintiff and his wife had separately stated to the Oak Park police officer that Plaintiff had pushed his wife's head into the passenger side window during an altercation, and that the arresting officer had observed

the wife "bleeding from the top of the forehead, along with a large bump above her right eye and on the right side of her forehead," and using a tissue paper to wipe the blood from her face. (Doc. 64, Arrest Report, at 3; Doc. 65, Police Report, at 3). The arrest reports also reflected that the officer saw what appeared to be a print of a forehead on the passenger side window. (*Id.*). Most troubling for Sterenberg was Plaintiff's statement to the officer (put in quotation marks in the report) that "I may have been too heavy handed because I deal with inmates all the time." (*Id.*; Doc. 72 ¶ 28; Doc. 73 ¶ 9). As Sterenberg explained at his deposition, this left him concerned that Plaintiff, a probationary deputy, would no longer be able to represent the Sheriff's Office in use of force settings. (Doc. 73 ¶ 30; Doc. 56-4, at 27-28, Sterenberg Dep., at 26-27).

Plaintiff denies that he did anything wrong and insists the arrest was not justified. (Doc. 73 ¶ 8; Doc. 56-3, at 19, Plaintiff Dep., at 65). He notes that Sterenberg admitted he had no idea whether Plaintiff was actually guilty of the crime of domestic battery, and stresses that even though the police reports contained conflicting information as to whether Plaintiff was the aggressor or the victim of his wife's attack, Sterenberg never spoke with Plaintiff about what occurred. (Doc. 69 ¶¶ 14, 32-34). Regardless, Plaintiff does not deny that the police reports (including photos) contained information witnessed by an Oak Park police officer, as well as troubling statements made to that officer about Plaintiff pushing his wife's head into the window (drawing blood) and being heavy handed due to his work with inmates. Plaintiff fails to explain why these facts as set forth in the reports would be less concerning to an Acting Bureau Chief if Plaintiff's wife had kicked him first. Notably, Sheriff Zaruba (who, as stated previously, could not have held any discriminatory animus towards Plaintiff since he was unaware of his race) agreed with

Sterenberg's recommendation that Plaintiff be discharged based on the contents of the sworn police reports. (*Id.* ¶¶ 35, 36; Doc. 72 ¶¶ 63, 64; Doc. 73 ¶¶ 34, 35).

As for Sterenberg's failure to wait for Bibbiano's internal affairs report, there is nothing inherently suspicious about this given that the police reports already in hand contained the key information from the Oak Park police officer. Significantly, Plaintiff does not argue that Bibbiano's report contained any new information that may have changed Sterenberg's mind.[6] Nor does Plaintiff point to any evidence that Sterenberg waited for internal affairs reports in other cases involving non-black deputies. Plaintiff's evidence of purported suspicious timing is of little probative value under these circumstances.

### C. Treatment of Alleged Comparators

Plaintiff argues that the "strongest evidence of discriminatory intent" is that similarly situated non-black employees who were arrested "were treated much more leniently" than Plaintiff. (Doc. 71, at 8). Discrimination can certainly be inferred when "an employer treats an employee in a protected class less favorably than it treats a similarly-situated employee outside that class." *de Lima Silva*, 917 F.3d at 559 (citing *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012)). "In the usual case a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Skiba v. Ill. Central R.R. Co.*, 884 F.3d 708, 723 (7th Cir. 2018) (quoting *Coleman*, 667 F.3d at 847). "Whether a comparator is similarly situated is usually a question for the

---

[6]   Bibbiano's report indicated that the charges against Plaintiff were dropped on January 27, 2015, but that does not constitute evidence that the police reports were false or that Sterenberg acted with a discriminatory motive in relying on them. (Doc. 72-6, at 7).

fact-finder, and summary judgment is appropriate only when no reasonable fact-finder could find that plaintiffs have met their burden on the issue." *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 629 (7th Cir. 2018) (quoting *Coleman*, 667 F.3d at 846-47). For reasons discussed below, the proffered comparator evidence relied on by Plaintiff does not allow an inference of discriminatory animus.

### 1.    Probationary Employee

Plaintiff has identified seven non-black employees as the comparators. None of these individuals was subject to the same standards as Plaintiff since none was on probationary status when disciplined. It is well settled that probationary employees are not similarly situated to permanent employees for purposes of establishing a claim of discrimination. *Steinhauer v. DeGolier*, 359 F.3d 481, 484-85 (7th Cir. 2004) ("Purifoy and Steinhauer were not similarly situated because Steinhauer was still on probation while Purifoy was not."); *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 694 (7th Cir. 2005) (same); *Gingras v. Milwaukee County*, 127 F. Supp. 3d 964, 978 (E.D. Wis. 2015) (alleged comparator "is not similarly situated because he was not a probationary employee, and the plaintiff was.").

Here, six of the seven comparators who were disciplined were non-probationary deputy sheriffs afforded protection under the Merit Commission. The parties agree that Plaintiff was not brought up on charges before the Merit Commission because he was a probationary employee. (Doc. 72 ¶ 34). *See O'Neal v. Shinseki*, No. 13 C 653, 2015 WL 1396375, at *8-9 (N.D. Ill. Mar. 24, 2015) (employee who had no right of appeal to Merit Systems Protection Board not similarly situated to employee who had such right). And

Sterenberg admittedly considered Plaintiff's probationary status in deciding to terminate him. (Doc. 72 ¶ 53; Doc. 73 ¶ 28).[7]

### 2. Different Decisionmaker

There is another problem with the proffered comparators: Sterenberg had no role in deciding the discipline of any of the named individuals. (Doc. 72 ¶¶ 43, 44, 57). "The inference of discrimination is weaker when there are different decision-makers, since they 'may rely on different factors when deciding whether, and how severely, to discipline an employee.'" *Coleman*, 667 F.3d at 847 (quoting *Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 826 (7th Cir. 2008)). Defendant argues that since Sterenberg was the decisionmaker and had no role in disciplining the seven employees, there are no proper comparators to support an inference of discrimination. (Doc. 55, at 11-12; Doc. 74, at 7).

Plaintiff concedes that Sterenberg had no role in disciplining the alleged comparators but claims this is irrelevant because Sterenberg did not act alone. According to Plaintiff, all of the alleged comparators "were arrested under Sheriff Zaruba's regime," and Zaruba served as "the ultimate decisionmaker." (Doc. 71, at 10, 11). True, but as noted earlier, it is undisputed that Sheriff Zaruba had no knowledge of Plaintiff's racial or ethnic background, and accepted Sterenberg's recommendation because he believed the information in the Oak Park police reports indicated that Plaintiff had committed a domestic battery. (Doc. 72 ¶ 64). Given this, a jury would be hard pressed to infer that

---

[7] The seventh employee was not covered under the Merit Commission because he was not even a deputy sheriff but rather a civilian IT employee arrested for unspecified "conduct unbecoming," possibly involving public intoxication. (Doc. 72 ¶ 11; Doc. 56-5, at 42, Bibbiano Dep., at 158, 161). Plaintiff provides no basis for inferring that an IT employee would have been held to the same performance standards as a deputy sheriff. Nor is there any evidence that the IT employee's conduct involved a physical altercation or that he would ever need to represent the Sheriff's Office in use of force settings. *de Lima Silva*, 917 F.3d at 559.

Zaruba treated Plaintiff more harshly than the non-black comparators because of Plaintiff's race.

Even apart from the above hurdles, the record shows that Sheriff Zaruba sought termination by the Merit Commission for two of the six deputy sheriff comparators, so did not treat these non-black deputies more leniently than Plaintiff.[8]  For the remaining four deputy sheriffs, Plaintiff failed to provide any evidence indicating what discipline Sheriff Zaruba sought or imposed, and Bibbiano did not testify about this at his deposition, so there is no basis to infer that Zaruba treated these deputies more leniently.  (Doc. 71, at 8-10; Doc. 75 ¶¶ 4-11).

### D.    Cat's Paw:  Title VII Claim

Undaunted, Plaintiff indicated for the first time at oral argument in response to questions posed by the Court that he is relying on a "cat's paw" theory of liability whereby the racial animus of Internal Affairs Investigator Bibbiano is imputed to the decisionmakers.  Under this theory, Bibbiano used Sterenberg and/or Zaruba as "dupe[s] in a deliberate scheme to trigger a discriminatory employment action."  *Grant*, 870 F.3d at 570.  Cat's paw liability attaches "when 'a non-decision-making employee with discriminatory animus provided factual information or input that may have affected the adverse employment action.'"  *Miller v. Polaris Labs., LLC*, 797 F.3d 486, 490 (7th Cir. 2015) (quoting *Matthews v. Waukesha Cty.*, 759 F.3d 821, 829 (7th Cir. 2014)).  Plaintiff's theory, however, is not that Bibbiano provided a biased report or evaluation to the decisionmakers (he acknowledges the Oak Park police reports they relied on were

---

[8]        *See* Doc. 56-5, at 46-47, Bibbiano Dep., at 177-78 (Sheriff filed a Merit Board complaint recommending discharge of Deputy R.O., though Bibbiano believes an arbitrator imposed a 90 day suspension); *Id.* at 35, 47, Bibbiano Dep., at 130-31, 180-81 (Sheriff sought termination of Corporal S.D. through the Merit Commission but he was only suspended).

authentic and unaltered), but that, due to racial animus, he *recommended* Plaintiff's termination.

As an initial matter, Plaintiff has waived this cat's paw argument since he "does not discuss or even cite any cases addressing what showing is necessary to survive summary judgment under [a cat's paw] theory." *Anderson v. Ill. Central R.R. Co.*, No. 17 C 1387, 2019 WL 1438567, at *11 (N.D. Ill. Mar. 31, 2019) (citing *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) and finding waiver of perfunctory and undeveloped cat's paw argument in opposition to summary judgment). Even were the argument not waived, Plaintiff's cat's paw theory fails. To prevail on the Title VII claim using a cat's paw theory, the evidence must establish that (1) Bibbiano performed a specific act due to animus; (2) he intended that act to cause an adverse employment action; and (3) that act was the proximate cause of the adverse employment action. *Staub v. Proctor Hosp.*, 421 F. App'x 647, 648 (7th Cir. 2011); *Omachonu v. Shields*, No. 15-CV-69-WMC, 2015 WL 4509146, at *6 (W.D. Wis. July 24, 2015) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)). Here, the evidence is insufficient for a reasonable jury to find either that Bibbiano committed a specific act due to racial animus or that the act was the proximate cause of Plaintiff's termination.

### 1.    Bibbiano's Alleged Racial Animus

Plaintiff argues that Bibbiano's racial animus can be inferred because he allegedly recommended harsher treatment for Plaintiff than for certain non-black comparators. He relies, however, on the same comparators discussed previously who, as noted, are *not* similarly situated because none was a probationary employee. *See supra* at 15.

Moreover, Plaintiff provided no evidence that Bibbiano had a role in recommending discipline for two of the six deputy sheriffs (S.N. and J.S.).[9]

As for the remaining four deputy sheriffs, Plaintiff has supplied Bibbiano's internal affairs reports for them and for Plaintiff so that the written recommendations in these reports may be compared. In the report for Plaintiff, Bibbiano wrote a single sentence under the recommendation section: "If it is determined that [Plaintiff] has merited status with the Office I recommend that charges be brought before the Merit Commission." (Doc. 72-6, at 8). For two of the four non-black deputies who are comparators (R.O. and S.D.), Bibbiano similarly recommended that charges be brought before the Merit Commission (or that "thought" be given to this) upon concurrence with his report.[10] The Court is not persuaded that a reasonable jury could infer from any differences in the wording of these recommendations that Bibbiano proposed more harsh discipline of Plaintiff than of the non-black deputies. Indeed, for Plaintiff and Deputy S.D., Bibbiano did not recommend any specific discipline at all – only that charges be brought before the Commission. This implicitly conveyed Bibbiano's belief that at least a 30 day suspension was warranted since lesser discipline did not necessitate Merit Commission charges. (Doc. 56-5, at 29,

---

[9]     Based on Bibbiano's deposition testimony, he had no involvement at all in the investigation of S.N. (Doc. 56-5, at 43, Bibbiano Dep., at 162-63). While he investigated J.S. for driving under the influence, that deputy retired while the investigation was still pending and Bibbiano never made a recommendation. (*Id.* at 12-13, Bibbiano Dep., at 41-42).

[10]     The report for S.D. (dated 4/11/2014) states: "I recommend that Chief Davis review this report and investigation in its entirety. If concurred with I recommend that thought be given to bringing charges in front of the Sheriff's Merit Commission." (Doc. 72-2, at 6). The report for R.O. (dated 9/12/2012) states: "I recommend that an independent review of this investigation is conducted, and if concurred with, charges are brought with the Sheriff's Merit Commission against [the] Dep[uty] to verify if, in fact, Office regulations were violated. Moreover, if the Merit Commission finds these regulations were violated discipline (sic) it may necessitate discipline in excess of 30 days." (Doc. 72-1, at 9). Sheriff Zaruba sought termination of both deputies before the Merit Commission. *See supra* n. 8.

33, Bibbiano Dep., at 108-109, 122). With Deputy R.O., Bibbiano was explicit in this regard, recommending charges before the Commission because the conduct "may necessitate discipline in excess of 30 days." (Doc. 72-1, at 9).

Plaintiff also believes Bibbiano's discriminatory animus can be inferred because he never bothered to question him about what happened with his wife on the morning of January 18, 2015, leaving his side of the story unknown at the time of his termination. (Doc. 71, at 6; Doc. 69 ¶¶ 21, 22). Plaintiff claims that in several other investigations involving non-black deputies, Bibbiano "took pains to get the accused['s] side of the story." (Doc. 71, at 6; Doc. 75 ¶¶ 6-8; Doc. 56-5, at 31, Bibbiano Dep., at 116-17, 126) (indicating that Bibbiano interviewed one of the deputies charged with DUI and the deputy charged with marijuana possession). But it is not entirely accurate to say Bibbiano lacked the benefit of Plaintiff's side of the story. After all, he was interviewed by the Oak Park police officer immediately after the altercation and arrest, and again at the Oak Park police station later the same day, and Plaintiff's statements were summarized in the police reports that Bibbiano obtained and Sterenberg then reviewed.

Even apart from this, Plaintiff again seeks to compare his treatment (here the thoroughness of the investigation) with that of non-probationary employees subject to the Merit Commission. Proper comparators, however, would be other probationary employees. And in any event, review of Bibbiano's four internal affairs reports for the non-probationary comparators undermines Plaintiff's argument; they show that Bibbiano did not interview one of the non-black comparators and instead relied solely on the police reports, just as he did in Plaintiff's case. (Doc. 56-5, at 38, Bibbiano Dep., at 142; Doc. 72-3). Plaintiff fails to address this evidence or explain how a reasonable jury could infer

that Bibbiano "actually harbored discriminatory animus against him" where he treated Plaintiff the same as a white deputy. *McDaniel v. Progress Rail Locomotive, Inc.*, __ F.3d __, 2019 WL 5057188, at *5 (7th Cir. Oct. 9, 2019). *Cf. Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010) (supervisor's "unusual" decision to personally conduct an investigation into the plaintiff's alleged misconduct and to ignore exculpatory evidence from the person who ordinarily conducted those investigations constituted circumstantial evidence of an unlawful motive).

### 2. Proximate Cause

The final problem with Plaintiff's cat's paw theory is that the evidence must allow a reasonable jury to find that Bibbiano performed a specific act due to racial animus with intent to cause Plaintiff's termination, and that this act was the "proximate cause" of the termination. *Turner v. Hirschbach Motor Lines*, 854 F.3d 926, 929 (7th Cir. 2017). But Plaintiff concedes that Bibbiano gave Sterenberg unaltered copies of the Oak Park police reports, and has not identified any other factual information that Bibbiano provided prior to the termination. In other words, there is no evidence that the decisionmakers relied on biased factual information provided by Bibbiano. *Cf. Staub*, 562 U.S. at 421 ("But if the independent investigation relies on facts provided by the biased supervisor – as is necessary in any case of cat's-paw liability – then the employer (either directly or through the ultimate decisionmaker) will have effectively delegated the factfinding portion of the investigation to the biased supervisor.").

During oral argument, Plaintiff took the position that Bibbiano proximately caused the termination because, at a meeting with Sterenberg on January 20, 2015 (the day before Plaintiff was fired), Bibbiano verbally recommended Plaintiff's firing. Oddly, in his

Local Rule 56.1 responses, Plaintiff both admitted and denied that Bibbiano "had no role in recommending disciplinary action" against him. (Compare Doc. 72 ¶¶ 54, 61 with Doc. 73 ¶ 33). The denial is based entirely on deposition testimony from Sterenberg regarding a meeting he had with Sheriff Zaruba and Bibbiano on January 20, 2015. When asked whether Sheriff Zaruba's decision to issue the termination letter was based solely on Sterenberg's recommendation, Sterenberg stated: "Mine . . . and I believe Frank Bibbiano." He was then asked: "You recall Bibbiano recommending termination as well?" to which he responded: "I don't recall him specifically recommending termination, and I don't recall him objecting to it." (Doc. 56-4, at 30, Sterenberg Dep., at 29).

Of course, Sterenberg cannot testify as to Sheriff Zaruba's state of mind. FED. R. EVID. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Moreover, it is undisputed that Sterenberg personally reviewed the Oak Park police reports, and it was his opinion and belief after doing so, and taking into account that Plaintiff was a probationary employee, that the incident described in the reports rose to such a level that Plaintiff should be discharged. (Doc. 73 ¶ 28). It is further undisputed that Sterenberg recommended to Sheriff Zaruba that Plaintiff be terminated based on his belief that Plaintiff would no longer be able to represent the Sheriff's Office in use of force settings in light of his statement to the Oak Park police that he may have been too heavy handed (with his wife) because he was a correctional officer. (*Id.* ¶¶ 29-31). Finally, the parties agree that in deciding to terminate Plaintiff, Sheriff Zaruba relied on the information Sterenberg provided, and concurred with Sterenberg's recommendation because it was

his understanding that the information in the police reports indicated that Plaintiff had committed a battery against his wife. (Doc. 72 ¶¶ 58, 64; Doc. 73 ¶ 35).[11]

Under all of these facts, the Court concludes there is insufficient evidence for a reasonable jury to infer that Bibbiano's alleged verbal recommendation was the proximate cause of Plaintiff's termination. *Cf. McDaniel*, __ F.3d __, 2019 WL 5057188, at *5 (no proximate cause where Safety Committee relied in part on materials compiled and submitted by biased subordinate but the plaintiff did "not allege that anything in these materials was false," and the Safety Commission also reviewed and relied on materials not submitted by the biased subordinate, including a medical report and the plaintiff's own statements).

### E.    Cat's Paw: Section 1983 Official Capacity Claim

Establishing liability under the Section 1983 Equal Protection Clause claim based on Bibbiano's alleged biased recommendation poses an additional challenge. It is highly questionable whether a party may even rely on a cat's paw theory to establish the liability of a municipality (here Sheriff Zaruba sued in his official capacity) for such a claim. The plaintiff must show that the challenged acts were performed pursuant to a municipal policy or custom. *Wragg*, 604 F.3d at 467. Since Zaruba is the Sheriff, his single action in discharging an employee unlawfully may represent official policy for purposes of municipal liability provided his decision is deliberate and intentional. *Board of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 415 (1997) ("As we recognized in *Monell* and have repeatedly reaffirmed, Congress did not intend municipalities to be held liable unless deliberate action attributable to the municipality directly caused a

---

[11]    Sheriff Zaruba was not deposed by either side.

deprivation of federal rights[,]" so under facts presented single hiring decision of Sheriff was not properly attributable to municipality). Under Plaintiff's cat's paw theory, however, Sheriff Zaruba did not act deliberately or intentionally in discharging Plaintiff on account of his race but instead served as a dupe who unwittingly committed a constitutional violation orchestrated by Bibbiano.

The Seventh Circuit has also questioned "how, or whether, this type of imputed motive applies in the municipal liability context" given *Monell*'s prohibition against "finding municipal liability through the theory of *respondeat superior*." *Simstad v. Scheub*, 816 F.3d 893, 902 (7th Cir. 2016) ("We have wondered whether the cat's paw theory can support entity liability under the civil rights laws when the entity is a municipal corporation and the biased or retaliatory subordinate is not a policy-maker."). In *Sroga v. Preckwinkle*, No. 14 C 6594, 2017 WL 345549 (N.D. Ill. Jan. 24, 2017), a court in this district rejected the plaintiff's attempt to hold the Cook County Forest Preserve District liable for a supervisor's exercise of discretion where the supervisor was not a final policymaker. *Id.* at *6. As the court explained, "[a]llowing an expansion of *Monell* via the cat's paw theory would be a 'step towards overruling *Monell* and adopting the doctrine of *respondeat superior*." *Id.* at *6 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 131 (1988)).[12]

This Court need not reach this novel issue posed by the Section 1983 official capacity claim (and not briefed by the parties) since Plaintiff is unable to marshal sufficient evidence to withstand summary judgment even under Title VII. *See Outley v. City of*

---

[12] Plaintiff conceivably would still have an avenue of relief by suing Bibbiano individually. *See Smith v. Bray*, 681 F.3d 888, 899 (7th Cir. 2012) (individual liability is appropriate under § 1981 when "subordinate with a retaliatory motive . . . caus[es] the employer to retaliate against another employee."), overruled on other grounds by *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016).

*Chicago*, 354 F. Supp. 3d 847, 872 (N.D. Ill. 2019) ("[B]ecause the court has determined that no reasonable jury could find a violation of Title VII, it follows that no reasonable jury could find that the . . . defendants violated [the plaintiff's] constitutional rights.").

### F. Evidence as a Whole

Stepping back and viewing the evidence as a whole in the light most favorable to Plaintiff, there are no facts or inferences that would permit a reasonable jury to conclude that he was fired because of his race. Sheriff Zaruba could not have had racial animus towards Plaintiff since he did not know Plaintiff's race. Plaintiff has no evidence to support his "strongest" argument that similarly situated non-black deputies who engaged in comparable misconduct were treated more favorably by Sterenberg because none of the alleged comparators was a probationary deputy like Plaintiff, none had been disciplined by Sterenberg, and none had stated (following arrest for battery or other use of force) that he may have "been too heavy handed because I deal with inmates all the time." Nor can discriminatory animus be inferred from Sterenberg's use of the discretionary progressive discipline policy. Even if Plaintiff could show that Sterenberg's decision to fire him based on the police reports was premature or hasty, that in no way raises an inference that Sterenberg believed the reports were false or that his real motivation was discrimination. *See Coleman*, 667 F.3d at 852 ("It is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee.").

Adding Bibbiano to the picture does not support a different conclusion. There is no evidence that Bibbiano harbored racial animus towards Plaintiff, or that he used Sheriff Zaruba and Sterenberg as unwitting dupes to effectuate his discriminatory plan. In fact, Bibbiano treated Plaintiff the same as a white deputy when he decided not to interview

either of them about their alleged misconduct and instead rely on the police reports. And Bibbiano treated Plaintiff the same as two additional white deputies when he recommended that they be brought up on charges before the Merit Commission. Plaintiff may believe the process would have been more fair if someone had asked him his side of the story, or if Sterenberg would have waited for Bibbiano's internal affairs report. Yet "[t]he question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). Plaintiff has no evidence that Sterenberg did not honestly believe, based on the police reports he reviewed, that Plaintiff would not be able to represent the Sheriff's Office in use of force settings, and nothing in the record suggests that his true motivation in recommending Plaintiff's firing was racial animus. Defendant's motion for summary judgment on Plaintiff's Title VII and Section 1983 race discrimination claims is granted.

## IV.    IHRA Claim

Having granted summary judgment on all of Plaintiff's federal claims, the Court must determine whether to retain jurisdiction over the state law IHRA claim. "When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010). The Seventh Circuit has identified three "circumstances that may displace the presumption," including (1) "the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court"; (2) "substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication

of effort"; and (3) "it is absolutely clear how the pendent claims can be decided." *RWJ Mgmt. Co. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012).[13]  None of the exceptions applies in this case and the Court thus declines to retain jurisdiction over the state law IHRA claim.  The parties' cross-motions for summary judgment on that claim are both denied without prejudice.

## CONCLUSION

For reasons stated above, Defendant's Motion for Summary Judgment [54] is granted as to the Title VII and Section 1983 race discrimination claims, and denied without prejudice as to the state law IHRA claim.  Plaintiff's Motion for Partial Summary Judgment on the IHRA claim [58] is denied without prejudice.

ENTER:

Dated: October 25, 2019

_____
SHEILA FINNEGAN
United States Magistrate Judge

---

[13]  "The first of the Seventh Circuit's three exceptional circumstances is likely no longer relevant, as amendments to Section 1367 now require state courts to treat any applicable limitations clock as paused while a re-filed matter was pending in federal court." *Foster v. Local Union 8A-28A Metal Refinishers, Painters, Sign & Display, Equip. & Automotive Painters*, No. 16 C 4174, 2018 WL 4467118, at *2 n.2 (N.D. Ill. Sept. 17, 2018) (citing *Artis v. District of Columbia*, 138 S. Ct. 594 (2018)).